AUSA:     John R. Neal          Telephone:  (313) 226-9644

AO 91 (Rev. 11/11)  Criminal Complaint          Special Agent:     Shanika Sanders          Telephone:  (313) 226-2573

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

| | |
|---|---|
| United States of America<br><br>v.<br><br>D-1 Serenity Poynter<br>D-2 Jermaine Rose | Case: 2:20−mj−30303<br>Assigned To : Unassigned<br>Assign. Date : 8/18/2020<br>CMP: SEALED MATTER (MAW) |

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____July 2020 through the present_____ in the county of _____Wayne_____ in the
_____Eastern_____ District of _____Michigan_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Poynter and Rose: | |
| 18 U.S.C. 1343 | Wire Fraud |
| 18 U.S.C. 1341 | Mail Fraud |
| | |
| Rose: | |
| 18 U.S.C. 666 | Theft of Government Funds |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

 Special Agent Shanika Sanders 
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

_____
*Judge's signature*

Date:  August 18, 2020  

City and state:  Detroit, MI          Elizabeth A. Stafford, U.S. Magistrate Judge
David R. Grand          *Printed name and title*

## Affidavit in Support of an Application for an Arrest Warrant

I, Shanika Sanders, being first duly sworn, hereby depose and state as follows:

## Introduction and Agent Background

1.      I am a Special Agent (SA) of the U.S. Department of Labor, Office of
Inspector General (DOL/OIG), and have been so employed since January 2016.
Prior to this assignment, I was employed as an investigator in Industry Operations
for the Bureau of Alcohol, Tobacco, Firearms and Explosives for three years.  I am
currently assigned to the Detroit Field Office of DOL/OIG.  During my years at the
Department of Labor, I have conducted numerous investigations into criminal
violations of both Title 29 and Title 18 of the United States Code. During this time,
I have been either the lead agent or supporting agent on several investigations
involving criminal schemes targeting the State of Michigan's (SOM)
Unemployment Insurance Agency (UIA) through the filing of false or fictitious
unemployment insurance (UI) claims. Based on my direct personal experience with
these cases, I have become familiar with the methods that criminals use to attack
and exploit the UI systems as well as tools and methods criminals often utilize to
facilitate that fraud.

2.      I have graduated from the Criminal Investigator Training Program (CITP)
and the Inspector General Investigator Training Program (IGITP) at the Federal

Law Enforcement Training Center (FLETC).  I attended and participated in joint in-service sessions for DOL-OIG/OI-LRF agents and Federal Bureau of Investigation (FBI) agents, for training on the current criminal laws prohibiting labor racketeering and other criminal violations of Title 18 and Title 29 of the United States Code.  I have also received training in documentary and electronic evidence given by members of the Computer Crime & Intellectual Property Section (CCIPS) of the U.S. Department of Justice (DOJ).  Furthermore, I received training specific to insider threats and internal employee investigations in IGITP as employee integrity investigations commonly worked by IG agents.

3.      As a result of my participation in this investigation, I submit that there is probable cause to believe that **Serenity Poynter** and State of Michigan Lead Claims Examiner **Jermaine Rose** have committed federal crimes, including but not necessarily limited to mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and conspiracy to commit those crimes (18 U.S.C. § 1349). I also believe that there is probable cause to believe that **Jermaine Rose** has violated 18 U.S.C. § 666 (Theft from Program Receiving Federal Funds).

4.      I make this affidavit based upon personal involvement in the subject criminal investigation, including review of law enforcement databases, financial documents, Internet Service Provider (ISP) records, and unemployment insurance claims data from SOM records detailing a large scale UI fraud scheme perpetrated

by **Serenity Poynter**, and State of Michigan Lead Claims Examiner **Jermaine Rose**.

I have also been provided with information from other law enforcement agents and officials from the United States Secret Service (USSS), and the State of Michigan's Fraud Investigation Unit (SOM-FIU).  Because this affidavit is submitted for the sole purpose of supporting a criminal complaint and arrest warrants, it does not necessarily contain all information and facts discovered and developed in the course of this investigation.

### Summary

5.      In early July 2020, my agency received allegations involving a fraud scheme aimed at defrauding the SOM and the U.S. Government of millions of dollars earmarked for Pandemic Unemployment Assistance (PUA).  In reviewing these allegations, investigating agents identified SOM UIA Lead Claims Examiner **Jermaine Rose** as a target of the investigation.  The investigation has shown that **Jermaine Rose** has used his position as an agent and employee of the SOM UIA to wrongfully release payment on multiple fraudulent UI claims filed against the SOM, including multiple claims filed by **Serenity Poynter**.  **Jermaine Rose** was not assigned nor had any legitimate reason to access, let alone modify, the claims. **Jermaine Rose's** actions have resulted in an actual loss of approximately

$1,011,000.  Between July 3, 2020 and July 30, 2020, when he was suspended by the agency, **Jermaine Rose** attempted to override holds on approximately $761,000 in additional fraudulent claims.  These later attempts were blocked due to daily monitoring by SOM.

### Unemployment Insurance – Background & COVID-19

6.     The Social Security Act of 1935 initiated the federal and state unemployment insurance system.  The system provides benefits to individuals who are unemployed for reasons beyond their control.  The purpose of the UI system is twofold:  first, to lessen the effects of unemployment through cash payments made directly to laid-off workers, and second, to ensure that life necessities are met on a weekly basis while the worker seeks employment.  In the State of Michigan, the UI system is administered by the Unemployment Insurance Agency, which is part of the SOM's Department of Labor and Economic Opportunity (DLEO).  The U.S. Department of Labor funds many UIA administrative costs, including salaries, office expenses, and computer equipment.

7.     State unemployment systems and benefits are joint state and federal enterprises largely financed by taxes on private employers located in that state. When state unemployment benefits are exhausted, they may be supplemented by federal funds appropriated by the U.S. Department of Labor. At the time of this

application, the federal government is providing significant supplemental benefits

to the states as a result of the COVID-19 pandemic.  For the purposes of this

warrant and for establishing probable cause under 18 U.S.C. Section 666, I note

that the Michigan UIA has received well in excess of $10,000 in federal funds over

the past year.

8.     The Families First Coronavirus Response Act (FFCRA) became law on

March 18, 2020, and provided additional flexibility for state unemployment

insurance agencies and additional administrative funding to respond to the

COVID-19 pandemic. The Coronavirus Aid, Relief, and Economic Security

(CARES) Act was later signed into law on March 27, 2020.

The CARES act further expanded states' ability to provide unemployment

insurance for many workers impacted by the COVID-19 pandemic, including for

workers who are not ordinarily eligible for unemployment benefits.  One such

program established to accomplish that end was the Federal Pandemic

Unemployment Compensation (FPUC) program.  The FPUC allows eligible

individuals who are collecting certain UI benefits, including regular unemployment

compensation, to receive an additional $600 in federal benefits per week for weeks

of unemployment ending on or before July 31, 2020. Additionally, the Pandemic

Emergency Unemployment Compensation (PEUC) program allows those who

have exhausted benefits under regular unemployment compensation or other

programs to receive up to 13 weeks of additional federally funded benefits. That is all to say, the recent federal legislation and programs detailed above allowed for a significant outlay of federal funds to flow to and through the states to offset the historic need for unemployment benefits by the American workforce, including in the State of Michigan and in the Eastern District of Michigan (EDMI).

9.      Normally (in the absence of fraud), an unemployed worker initiates an UI claim.  This can be accomplished by submitting a claim in person, over the telephone, or on the Internet.  Currently, the overwhelming majority of UI claims are filed online through the UIA's website.  In order to be eligible for UI benefits, the worker must demonstrate a certain level of earnings in several quarters immediately preceding the application.  The amount of unemployment benefits that a UI claimant might be eligible for depends on a variety of factors, including but not limited to the length of his or her previous employment and the amount of wages he or she earned.

10.     The SOM UIA will either approve or reject a UI claim based on the application made by the unemployed worker.  If the SOM UIA approves a UI claim, the claimant is required to re-certify the claim via telephone or Internet at various times during the life of the claim.  The worker must also certify that he or she is still unemployed and actively seeking work.  One way in which unemployment benefits are provided to a claimant is through the use of a debit

card, issued by the Bank of America (BOA), which is mailed to the claimant

through the U.S. Postal Service. The unemployment benefits are loaded onto the

debit card electronically, and additional benefits are loaded onto the card

electronically every two weeks.

## Unemployment Insurance – Fraud Prevention

11.     In an effort to prevent and otherwise inhibit external fraud, SOM UIA

captures certain external data surrounding the interaction between an individual

and the UIA system.  This data is compiled in a system named the "Michigan

Integrated Data Automated System" (MiDAS).  Each time a claim is accessed in

MiDAS, it creates a digital footprint of sorts.  Some of the data that the SOM

collects includes the dates, times, Internet Protocol (IP) address, and Media Access

Control (MAC) address associated with the device accessing the claim. SOM ties

this information to the user-entered information captured to facilitate the claim (i.e.

name, address, social security number, BOA or other bank account numbers, bank

routing numbers, etc.).  SOM's MiDAS system also utilizes certain proprietary

algorithms that automatically identify and stop possible fraud based on whether or

not a claim exhibits fraud indicators that exceed a designated threshold. Agents

also note that humans who review claims and conclude that the payments may be

involved in fraud can also take action to stop payment of the claims.

For the remainder of this affidavit, the investigating agent will refer to the process

detailed above as a "fraud-stop."

12.     In an effort to prevent and otherwise inhibit internal fraud or insider threats,

SOM UIA captures certain internal data surrounding the interaction between SOM

employees, contractors, consultants and MiDAS.  That is to say that MiDAS

maintains an "audit trail," which details any insider who touches, alters, or

otherwise modifies a claim. SOM can attribute an insider's actions to a particular

individual, as those accessing the system are required to enter unique credentials.

SOM also maintains workflow logs for its employees that detail which claims are

assigned to a particular employee.  Additionally, SOM maintains call logs to

document telephonic contact between employees and claimants.  The workflow

logs and call logs detail whether insiders had a legitimate reason to access or

modify a claim.

13.     Investigators from SOM's Fraud Investigations Unit have the ability to

access and review the data maintained for both external and internal actors in

MiDAS.  It is through the analysis of this data that investigating agents can identify

fraudulent trends and tendencies associated with the unemployment insurance

claims.

## Claims Examiner Jermaine Rose

14.     The investigation has shown that **Jermaine Rose** was hired by the State of Michigan on or about March 28, 2004 as an Unemployment Insurance Examiner.

15.     According to the Michigan Civil Service Commission Job Specification listed on the State of Michigan's website, an Unemployment Insurance Examiner (UIE) is responsible for reviewing and processing various UI claims using SOM equipment and the SOM's MiDAS system. UIEs provide services to claimants, employers, and the general public.

16.     **Jermaine Rose's** duty station was at the Michigan Department of Labor and Economic Opportunity located 3024 W. Grand Blvd. Detroit, Michigan 48202.  In March 2020 SOM employees began to work full time from their residence (aka Telework) due to the COVID-19 pandemic. To effectively telework, SOM employees were allowed to take their assigned electronic devices home.

17.      The SOM disclosed that in order to access the MiDAS system, UIEs are assigned an account with a unique username.   SOM records detail that **Jermaine Rose's** username to access the MiDAS system is "**rosej6**." **Jermaine Rose's** credentials are unique to him and no other SOM employee is provided with the username "**rosej6**."

18.     Information provided by SOM disclosed that employees must be logged in to the State of Michigan's virtual private network (VPN) before they can access the MiDAS system.  Like with the Midas system, each employee is issued a unique username that allows them access into the VPN.  SOM records show that **Jermaine Rose's** username is **rosej6**.

19.     In addition to a username, all users are assigned a unique security token.  To log into the VPN, users must enter a unique code generated by their security token.  The code on each security token alternates in intervals and is unique to each specific employee.

This is all to say, that a given user must log in with his or her unique username and password as well as with the unique code reflected on their security token at the time to ensure that only approved users are accessing the VPN and to ensure that each user accessing the VPN is who SOM believes they are.

20.     SOM disclosed that the IP address in most cases used by **rosej6** to log into the VPN was 24.35.25.25.

21.     Records from the internet service provider Wide Open West (WOW) show that the IP Address used to log into the VPN was located at the home of Brenda Rose.  Brenda Rose is **Jermaine Rose's** mother.  **Jermaine Rose** had been working there full time due to the COVID-19 pandemic.

## Probable Cause

22.     In early July 2020, SOM-FIU alerted DOL-OIG about a suspected Pandemic Unemployment Assistance (PUA) fraud scheme occurring involving a State of Michigan employee currently working from home at a residence located in the Eastern District of Michigan.

23.     SOM-FIU had determined that 18 UI claims were filed electronically using the same name, **Serenity Poynter**, and the same mailing address, XXXX Wesson St., Detroit, MI 48210.  After review of the claims, it was determined the driver license was the same for all the claims.  Also, the social security card uploaded with the claims shows the numbers transposed.  The last four of the social security number was changed for each claim.  **Jermaine Rose** improperly accessed, discarded Identity Verification (IDV) issues and released payments on the fraud-stop claims causing a loss over $58,000 to SOM.  Common judgement of a layman dictates that 18 different individuals with the same name and different social security numbers all utilizing the same Michigan driver's license is fraudulent on its face.

24.     The SOM-FIU investigators reviewing user **rosej6**'s audit logs recognized aforementioned activity as problematic and subsequently began a more extensive

review of his MiDAS audit logs. As of the date of this affidavit, investigating agents have uncovered the following fraudulent conduct:

25.     On July 1, 2020, **rosej6** typed in the social security numbers for six UI claims with the address listed as XXXX Fairfax St, Jacksonville, FL. **<u>Jermaine Rose</u>** reviewed the IDs uploaded with the claim, which were from multiple states to include Washington, and South Carolina.  None of the claims filed had Michigan wages.  He then discarded the IDV holds which allowed the payments to be processed.  The loss to SOM was $61,200.

26.     Also on July 1, 2020, **rosej6** typed in the social security numbers for five UI claims with the address listed as XXXX Chandler Ave., Lincoln Park, MI. **<u>Jermaine Rose</u>** reviewed the IDs uploaded with the claim, which were from multiple states to include Nevada, and California.  None of the claims filed had Michigan wages.

**<u>Jermaine Rose</u>** then discarded the IDVs, which allowed the payments to be processed.  The loss to SOM was $53,360.  However, the address has a total of eight fraudulent UI claims with a total loss to SOM of $72,880.

27.     On multiple days in June 2020, **rosej6** typed in the social security numbers for six UI claims with the address listed as XXXXX Ardmore St., Detroit, MI 48227.  **<u>Jermaine Rose</u>** reviewed the IDs uploaded with the claim, which were

from multiple states to include Oregon, and Louisiana.  None of the claims filed had Michigan wages.  He then discarded the IDVs which allowed the payments to be processed.  The loss to SOM was $64,240.

28.     On July 3, 2020, SOM-FIU put a stop on a claim tied to the previously mentioned Jacksonville, FL address for "id theft," then on July 6, 2020, **Jermaine Rose** discarded the IDV alert. The stop was still on, so **ROSE** tried to manually override the unpaid certifications to remove the stop placed by SOM-FIU. **Jermaine Rose** was unsuccessful.  On July 10, 2020, **Jermaine Rose** again tried to manually override the certifications to force payment of benefits.

29.     SOM-FIU made the determination that user **rosej6's** actions were fraudulent based on the fact that in the overwhelming majority, if not every case, **rosej6** overrode a fraud-stop placed on the underlying claim.  Review by SOM-FIU indicates that user **rosej6** neglected to notate the files as to why the stops were discarded, which is standard procedure for a UIE.  Additionally, SOM-FIU's review of user **rosej6** assigned work items failed to disclose any legitimate reason to access and/or modify the subject claims.  Finally, through the analysis of **rosej6's** audit logs, SOM-FIU determined that **rosej6** targeted specific claims generally associated with similar IP addresses and physical addresses.  That is to say, **rosej6** appeared to be intentionally overriding specific fraud-stops and his actions were not a result of randomly approving unrelated claims.

**Serenity Poynter**

30.     On April 30, 2020, **Serenity Poynter** electronically filed a PUA claim with the SOM.  On May 02, 2020, **Serenity Poynter** uploaded her Social Security card and her Michigan driver's license.  Due to her out of state Social Security Number, the system requested an Identity Verification (IDV).  On May 02, 2020, **Jermaine Rose** accessed the account and discarded the IDV.  **Serenity Poynter's** PUA claim was processed for payment.  With this original claim, **Jermaine Rose** was aware of the filing of the claim and the documents uploaded for verification.  However, **Jermaine Rose** would go on to discard fraud stops on at least 20 PUA claims in the name of **Serenity Poynter**, using the same documents with altered SSNs, for a total loss of approximately $116,000.  Several of these fraudulent Poynter claims are described in more detail below.

31.     On May 15, 2020, **Serenity Poynter** electronically filed a PUA claim with the SOM, utilizing the same address, phone number and email address from her previous claim.  However, no identification documents were uploaded.  **Serenity Poynter** used an SSN that ended in 3338.  This SSN belongs to a man who resides in Virginia.  Due to the name not matching the SSN, the system requested an Identity Verification (IDV).  On May 18, 2020, **Jermaine Rose** accessed the account and discarded the IDV.  **Serenity Poynter's** PUA claim was processed for payment.  The loss to SOM was $5,200.

32.     On May 21, 2020, **Serenity Poynter** electronically filed two PUA claims with the SOM, utilizing the same address, phone number and email address from her previous claims.  However, no identification documents were uploaded. **Serenity Poynter** used SSNs ending in 3156, belonging to a man who resides in New York and 0382, belonging to a man who resides in Colorado.  Due to the names not matching the SSNs, the system requested an Identity Verification (IDV).  On May 22, and May 24, 2020, **Jermaine Rose** accessed the accounts and discarded the IDVs.  **Serenity Poynter's** PUA claims were processed for payment. The loss to SOM was $12,680.

33.     On June 3, 2020, **Serenity Poynter** electronically filed a PUA claim with the SOM, utilizing the same address from her previous claims.  However, on this claim, D.P.'s phone number and email address was used.  D.P. and **Serenity Poynter** are married, and currently living together.  Also, a fake social security card was uploaded for verification.  On June 11, 2020, **Serenity Poynter** uploaded her Michigan driver's license and a forged Social Security card with a number ending in 3212.  This SSN belongs to a woman who currently resides in Florida. Due to the name not matching the SSN, the system requested an Identity Verification (IDV).  On June 16, 2020, **Jermaine Rose** accessed the account and discarded a Social Security Administration (SSA) Validation.  Pursuant to SOM-UIA policy, all SSA Validation Investigations must be sent to the Benefit Payment

Control to be reviewed.  **Serenity Poynter's** fraudulent claim was not.  **Serenity Poynter's** PUA claim was processed for payment by **Jermaine Rose**.  A Bank of America debit card was mailed to the address on file, 3421 Wesson St., Detroit, MI 48210.  The loss to SOM was $10,520.

34.     On June 21, 2020, **Serenity Poynter** electronically filed a PUA claim with the SOM, utilizing the same address from her previous claims.  Also, a fake social security card was uploaded for verification.  On June 21, 2020, **Serenity Poynter** uploaded her Michigan driver's license and a forged Social Security card with the number ending in 3020.  This SSN belongs to a man who currently resides in New York.  Due to the name not matching the SSN, the system requested an Identity Verification (IDV) and issued a fraud alert.  On June 22, 2020, **Jermaine Rose** accessed the account and discarded the IDV and the fraud alert.  **Jermaine Rose** added this note to the account, "Discarded IDV/Fraud Case as claimant provided driver's license and SSN card in web notices."  Having already processed a valid PUA claim, and an additional four fraudulent PUA claims, filed by **Serenity Poynter**, **Jermaine Rose** knew the documents provided were not valid, and the fraud alert should not have been discarded.  The loss to SOM was $9,760.

35.     On June 28, 2020, **Serenity Poynter** electronically filed a PUA claim with the SOM, utilizing the same address from her previous claims.  Also, a fake social security card was uploaded for verification.  On June 28, 2020, **Serenity Poynter**

uploaded her Michigan driver's license and a forged Social Security card with a
number ending in 4020.  This SSN belongs to a woman who currently resides in
Ohio.  Due to the name not matching the SSN, the system requested an Identity
Verification (IDV) and issued a fraud alert.  On July 1, 2020, **Jermaine Rose**
accessed the account and discarded the IDV and the fraud alert.

**Jermaine Rose** added this note to the account, "Discarded IDV/Fraud Case as
claimant provided driver's license and SSN card in web notices."  Having already
processed a valid PUA claim, and an additional five fraudulent PUA claims, filed
by **Serenity Poynter**, **Jermaine Rose** knew the documents provided were not
valid, and the fraud alert should not have been discarded.  The loss to SOM was
$10,520.

36.     In total, **Serenity Poynter** electronically filed over 25 PUA claims, using
different social security numbers and variations of her name. In doing so, she
attempted to defraud the State of Michigan out of approximately $353,000, and
actually obtained $116,000.

37.     On July 20, 2020, the affiant reviewed bank records provided by J.P.
Morgan Chase.  The Chase bank account was owned by **Serenity Faith Poynter**.
The bank account information was submitted as an account were the May 21, 2020
UI benefits would be deposited.  The account creation documents display XXXX

Wesson St., Detroit, MI as her residence.  The phone number XXX-XXX-2508 is displayed on the bank account documents.  This phone number was used as a method of contact for multiple claims filed by **Serenity Poynter**.  Also, the driver's license information provided, matches the ID used to provide identification for the multiple unemployment insurance claims.

38.     On July 22, 2020, the affiant reviewed bank records provided by Sutton Bank.  Sutton Bank provides a debit card for Cash App account users.  The Sutton Bank account was owned by **Serenity Faith Poynter**. The bank account information was submitted as an account were the May 13 and May 15, 2020 UI benefits would be deposited.  The account creation documents display XXXX Wesson St., Detroit, MI as her residence.  The email address poynterserenity@gmail.com is displayed on the bank account documents, and used for multiple unemployment insurance claims filed by **Serenity Poynter**.

39.     On August 3, 2020, the affiant reviewed bank records provided by Bank of America.  The Bank of America bank account was owned by **Serenity Poynter**.  The bank account information was submitted as an account were the June 3, 2020 UI benefits would be deposited.  The phone number XXX-XXX-2508 is displayed on the bank account documents.  Also, the email address poynterserenity@gmail.com is displayed on the bank account documents.

## **Search Warrant**

40.     On July 30, 2020 the Detroit offices of the DOL-OIG and the USSS

conducted a search warrant at the residence of **Jermaine Rose**.  **Jermaine Rose**

was interviewed by the affiant and USSS SA Alex Jenkins.  During the interview,

**Jermaine Rose** acknowledged knowing **Serenity Poynter**.  **Jermaine Rose** stated

**Serenity Poynter** was his barber's (D.P.'s) wife. **Jermaine Rose** also admitted

that he talks to **Serenity Poynter** everyday about her UI claim.  However,

**Jermaine Rose** denied knowing **Serenity Poynter** filed more than two PUA

claims with the State of Michigan.

41.     During the search warrant, three pages of social security numbers were

found alongside **Jermaine Rose's** work computer.  On the back of those pages

were a list of names and dollar amounts.

**Serenity Poynter's** name was written twice.  Once with the amount $250, and

another time with the amount $400.  Cash App records reviewed by the affiant

shows multiple peer to peer transactions of money sent to **Jermaine Rose** from

**Serenity Poynter**.

42.     Review of **Jermaine Rose's** cell phone, seized during the search warrant,

details telephonic communication with **Serenity Poynter**.  **Serenity Poynter's**

contact information was saved in the phone, with phone number XXX-XXX-2508.

The same phone number was used for the multiple UI claims filed by **Serenity Poynter**.  Also, there were text messages between **Serenity Poynter** and **Jermaine Rose** discussing UI claims.

## Uses of Mail and Wires

43.    After the Unemployment Insurance Agency accepted an unemployment claim, it transferred the initial unemployment benefits into an account associated with a bank, a prepaid debit card, or with an unemployment insurance debit card. UI funds are sent via wire from Michigan and processed through the Bank of America (which handles all Michigan UI processing), specifically through Bank of America data center locations in the states of Virginia and Texas. In this case, after the funds were processed through Bank of America, **Serenity Poynter** had some of the fraudulent UI benefits loaded to a Sutton Bank Visa debit card, attached to her Cash App account.  These funds were stored solely by Cash App's parent company, Square, Inc., which is located in San Francisco, CA.  Serenity Poynter used her Sutton Bank Visa debit card to make cash withdrawals from automated teller machines (ATMs) throughout the Detroit Metro area.  Therefore, the disbursement of these fraudulently obtained UI funds involved the use of interstate wires in furtherance of the scheme to defraud, which constitutes a violation of 18 U.S.C. § 1343.

44.     In at least one instance, an unemployment insurance debit card, provided by Bank of America, was mailed to Serenity Poynter through the United States mail to the address that she provided.  This debit card could be used to access the fraudulent UI funds via ATMs or could be used at accepting retailers for point of purchase transactions.  Also, in at least one instance, a Sutton Bank Visa debit card was mailed to Serenity Poynter through the United States mail, also to an address that she provided.  This debit card could be used to access the fraudulent UI funds via ATMs or could be used at accepting retailers for point of purchase transactions throughout the Detroit Metro area.   Therefore, the mailing of these debit cards, necessary to access the fraudulently obtained funds, involved the use of the United States mail in furtherance of a scheme to defraud, which constitutes a violation of 18 U.S.C. § 1341.

## Summary

45.     Your affiant has reviewed the activity detailed above and immediately recognizes it as consistent with a large-scale UI fraud scheme perpetrated by **Serenity Poynter**, **Jermaine Rose** and other co-conspirators currently unknown to law enforcement. The basis for my statement derives from the information below:

a.      During my career at DOL, I have worked several UI fraud cases involving multiple fraudsters and I am familiar with how criminals can manipulate the SOM's UI system to obtain fraudulent benefits.

b.      Within the last 30 days, I have had conversations with members of the law enforcement intelligence community concerning the rampant levels of PUA fraud occurring all over the country.  Those officials have discussed with me various scams and schemes they are tracking involving PUA including the possibility of insiders facilitating UI fraud schemes, including schemes similar to this.

Additionally, the FBI has advised that there are significant criminal resources and "guides" available through criminal networks on how to defraud various states, including SOM, of PUA benefits.  Many of these schemes involve coordinated efforts by a group of individuals who are communicating using electronic devices and social media.

c.      Within the last 10 days, I have received law enforcement information detailing a potential UI fraud scheme occurring in Michigan.  The information showed an individual soliciting and purchasing IDs from cooperators using social media platforms that s/he used to file fraudulent claims. Over social media, the individual told others that he had an insider at the State Of Michigan who could

push through claims.  I cannot affirmatively say at this time that this individual is working with **Jermaine Rose**, however reviews of **Jermaine Rose's** cell phone by the affiant does show that **Jermaine Rose** discussed UI claims with people via Facebook Messenger.

  d.  Based on **Jermaine Rose's** activity, it appears to me that outside co-conspirators are entering bad claims into MiDAS.  Those outsiders are communicating the names/social security numbers associated with the claims with **Jermaine Rose** who is discarding the fraud-stops on the bad claims and releasing the fraud payments.  Review of **Jermaine Rose's** cell phone seized during the search warrant shows he uses Facebook Messenger, calls and text messages to communicate during these fraud schemes with **Serenity Poynter** and others.  This is bolstered by SOM-FIU analysis that **Jermaine Rose's** activity does not appear random, but rather targeting specific claims.

## Conclusion

46. Based on the forgoing, there is probable cause to believe that **Serenity Poynter**, and **Jermaine Rose**, have committed federal crimes, including but not necessarily limited to mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and conspiracy to commit those acts (18 U.S.C. §, 1349) in connection with a scheme to defraud the federal/state unemployment insurance program an obtain

unemployment benefits by means of false and fraudulent pretenses and representations. There is also probable cause to believe that **Jermaine Rose**, an agent and employee of the State of Michigan Unemployment Insurance Agency, violated (18 U.S.C. § 666) by facilitating theft from a program that receives federal funds.

Respectfully submitted,

_Shanika R Sanders_

Shanika Sanders
Special Agent
U.S. Department of Labor –
Office of Inspector General

Sworn to before me and signed in my presence
and/or by reliable electronic means.

_David G. M_____

~~Elizabeth A. Stafford~~  David R. Grand
United States Magistrate Judge

August 18, 2020